UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,                    No.  1:13-cr-190

        v.                         Hon. Robert J. Jonker
                                         U.S. District Judge
KIM DURON MULDER and
CHARLES WAYNE BROOKS,           **THIRD SUPERSEDING**
                                         **INDICTMENT**

                Defendants.
_____/

    The Grand Jury charges:

## GENERAL ALLEGATIONS

**A.**  **Kentwood Pharmacy**

1.     Kentwood Pharmacy, L.L.C. ("Kentwood Pharmacy") filed articles of organization on or about February 13, 2001 with the Michigan Department of Consumer and Industry Services.  On or about March 27, 2001, the Michigan Department of Licensing and Regulatory Affairs issued Kentwood Pharmacy a Pharmacy license and Controlled Substance Facility license.

2.     From before 2006 to November 2, 2010, Kentwood Pharmacy operated both a retail pharmacy business that was open to the public and a closed pharmacy business that was not open to the public.  The closed pharmacy serviced persons residing in adult foster care homes and skilled nursing homes ("the homes").  By 2010, Kentwood Pharmacy was servicing approximately 800 homes.

3.     Kentwood Pharmacy purchased drugs from manufacturers outside of Michigan, including drugs such as Mirtzapine, Midodrine, Meloxicam, Janumet, Metformin, Methocarbamol, and Benztropine.

4.     Kentwood Pharmacy entered into contracts with public and private health insurance providers in order to receive reimbursement for claims submitted for pharmacy services provided to customers of the retail pharmacies and the closed pharmacy.  The defendant KIM DURON MULDER was the chief executive officer of Kentwood Pharmacy.  Richard Michael Clarke served as the Sales Director.  Lawrence Anthony Harden was a staff pharmacist and later assumed the role of chief pharmacist.  CHARLES WAYNE BROOKS and Erin Rivard were staff pharmacists.  Jessica Lynn Veldkamp was a drug packer and later assumed the role of pharmacy floor manager.  Elizabeth Catherine Morgan was an account manager and later assumed the role of billing manager.  Michelle Shedd was a licensed practical nurse who worked in the billing department and later as a customer service representative.  Gary William Franks was the distribution manager.   Heather Harden was a drug packer.

**B.  <u>The Federal Food, Drug and Cosmetic Act and Michigan Pharmacy Law</u>**

5.     The United States Food and Drug Administration ("FDA")  is the agency of the United States responsible for protecting the health and safety of the public by enforcing the Federal Food Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.* ("FDCA") and ensuring, among other things, that drugs and devices intended for use by humans are safe and effective for their intended use and that the labeling of such drugs and devices bear true and accurate information.  Pursuant to such responsibility, FDA publishes and administers regulations relating to the approval, manufacture, and distribution of drugs and devices.

6.     Pursuant to provisions of the FDCA, the term "drug" includes articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals and articles (other than food) intended to affect the structure or any function of the body of a man or other animal.  21 U.S.C. § 321(g)(1)(B) & (C).  The FDCA defines the term "label" to mean "a display of written, printed, or graphic matter upon the immediate container of any article."  21 U.S.C. § 321(k).  Under the FDCA, the term "labeling" means "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article."  21 U.S.C. § 321(m).

7.     The FDCA provides that a drug is deemed to be "misbranded" if "its labeling is false or misleading in any particular."  21 U.S.C. § 352(a).  According to FDA regulations, "[t]he lot number on the label of a drug should be capable of yielding the complete manufacturing history of the package.  An incorrect lot number may be regarded as causing the article to be misbranded."  21 C.F.R. § 201.18.

8.     The FDCA further provides that a drug is deemed to be "adulterated" if "it consists in whole or in part of any filthy, putrid, or decomposed substance . . . or . . . if it has been prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health."  21 U.S.C. § 351(a).

9.     The FDCA prohibits the doing of any act and causing any act to be done with respect to a drug while the drug, or any of its components, was held for sale after shipment in interstate commerce, if such act resulted in the drug being adulterated or misbranded.  21 U.S.C. § 331(k).

10.     Among other statutes and rules which regulate the practice of pharmacy in Michigan, MCL § 333.17741 directs, in relevant part, that "[t]he person to whom a pharmacy license is issued and the pharmacists on duty are responsible for compliance with federal and state laws regulating the distribution of drugs and the practice of pharmacy."

11.     MCL § 333.17766(f) directs that a person may not possess or control for the purpose of resale, sell, offer to sell, dispense, or give away "a drug, pharmaceutical preparation, or chemical that has been dispensed on prescription and has left the control of a pharmacist."

12.     MCL ' 333.17722 grants authority to the Michigan Board of Pharmacy to regulate, control, and inspect the character and standards of pharmacy practice in the state of Michigan.  Michigan Board of Pharmacy Administrative Rule 338.472 directs that "[f]or the protection of the public health and safety, prescription drugs or devices which have been dispensed and which have left the control of the pharmacist shall not be returned or exchanged for resale."

13.     Michigan Board of Pharmacy Administrative Rule 338.479(1) directs that "[a]ll labeling of prescription drugs shall comply with the requirements of the code and the federal food, drug, and cosmetic act, 21 U.S.C. § 301 et seq."

14.     Michigan Board of Pharmacy Administrative Rule 338.479(c) prohibits the return to stock of multi-unit dose drugs, defined in the Michigan Board of Pharmacy Rules as customized medication packages, and directs that A[m]edications that have been dispensed in [customized medication packages] may not be returned to stock or dispensed to another patient when returned to the pharmacy for any reason.@

C. **The Health Insurance Programs**

**The Medicare Program**

15.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program ("Medicare"), to pay for the costs of certain health care services.  Entitlement to Medicare benefits is based on age, disability, or affliction with end-stage renal disease.  42 U.S.C. §§ 426 and 426A.

16.     The Department of Health and Human Services ("HHS") is responsible for the administration and supervision of Medicare.  The Centers for Medicare & Medicaid Services, ("CMS"), an agency of HHS, is directly responsible for the administration of Medicare.

17.     On December 8, 2003, Congress enacted the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (the "MMA").  Title I of the MMA created new outpatient prescription drug coverage for Medicare beneficiaries ("Medicare Part D").  Medicare Part D went into effect on January 1, 2006.

18.     Various private prescription drug plans ("PDPs") have contracts with CMS to administer Medicare Part D.  Medicare beneficiaries sign up for prescription drug coverage with the PDPs.  Beneficiaries can obtain Part D benefits in two different ways: they can join a Prescription Drug Plan which covers only prescription drugs, or they can join a Medicare Advantage Plan that covers both prescription drugs and medical services.  PDPs, in turn, have contracts with Pharmacy Benefit Managers ("PBMs") to administrate the PDPs, including the processing and payment of prescription drug claims.  The PDPs and PBMs have contracts with the pharmacies that dispense prescription drugs to Medicare beneficiaries.

19.     Medicare, the PDPs, and PBMs are health care benefit programs, as defined in Title18, United States Code, Section 24(b).

20.     The Centers for Medicare and Medicaid Services promulgate a Prescription Drug Benefit Manual associated with prescription drug claims.  This Manual specifically describes examples of "pharmacy fraud, waste, and abuse" and includes as an example "[d]ispensing expired or adulterated prescription drugs:  Pharmacies dispense drugs that are expired, or have not been stored or handled in accordance with manufacturer and FDA requirements."

21.     Kentwood Pharmacy entered into agreements with PDPs and PBMs, responsible for processing Medicare Part D prescription drug claims, that required Kentwood Pharmacy to comply with state and federal rules and regulations that apply to pharmacy practice.

22.     Kentwood Pharmacy received more than $30,000,000.00 for Medicare Part D pharmacy claims from 2009 through 2010.

**The Michigan Medicaid Program**

23.     The Department of Community Health, Medical Services Administration, is an agency of the State of Michigan responsible for administering the Michigan Medicaid Program, which provides health insurance to Michigan residents who are  indigent or otherwise did not have traditional insurance coverage.  CMS is responsible for overseeing the Medicaid Program in participating states, including Michigan.

24.     Among the specific medical services and products provided by Medicaid are reimbursements to pharmacies for the provision of prescription drugs.  Through various contractors, including managed care organizations ("MCOs") and PBMs, Medicaid provides coverage for certain drugs.  Medicaid and these contractors are health care benefit programs, as defined in Title18, United States Code, Section 24(b).

25.     Kentwood Pharmacy was enrolled as a Medicaid provider in Michigan.

26.     Under the Michigan Medicaid Provider Manual, "[a]pplicable State and Federal laws, rules, regulations, and policies must be observed by participating pharmacies."

27.     Kentwood Pharmacy received more than $10,000,000.00 for Medicaid pharmacy claims submitted from 2009 through 2010.

**Blue Cross Blue Shield of Michigan**

28.     Blue Cross Blue Shield of Michigan ("BCBSM") is a health care benefit program, as defined in Title 18, U.S.C., Section 24(b), in that it was a private insurance program, affecting commerce, which provided coverage for eligible costs for services, including prescription drugs, to its subscribers.  Kentwood Pharmacy was a participating provider with BCBSM.

29.     The participation agreement between BCBSM and Kentwood Pharmacy limited "covered service" to dispensing "prescription drugs in conformance with all applicable state, local, and federal laws and regulations; with Pharmacist Professional Judgment; with all ethical standards prevailing in the pharmacy community, and with all BCBSM reimbursement policies and Program requirements."

30.     Kentwood Pharmacy received more than $3,000,000.00 for Blue Cross Blue Shield of Michigan pharmacy claims from 2009 through 2010.

## COUNT 1
### (Conspiracy to Commit Health Care Fraud)

31.     Paragraphs 1 through 30 are incorporated as though fully set forth herein.

32.     From in or before April 2009 and continuing to November 2, 2010, in the Southern Division of the Western District of Michigan and elsewhere, the defendants,

**KIM DURON MULDER and
CHARLES WAYNE BROOKS,**

did combine, conspire, confederate and agree with each other, and with others both known and unknown to the Grand Jury, to knowingly and willfully execute a scheme and artifice to defraud health care benefit programs in connection with the delivery of and payment for health care benefits, items, and services.

### PURPOSE OF THE CONSPIRACY

33.     It was the purpose of the conspiracy for the defendants to unlawfully enrich themselves by, among other things: (a) returning previously dispensed drugs to stock so that Kentwood Pharmacy could reuse the drugs to fill prescriptions for nursing and adult foster care home residents, and (b) submitting claims to Medicare, Medicaid and private insurers for drugs which were dispensed in violation of federal and state laws and regulations, including drugs which were previously dispensed, which were controlled substances that were returned to the pharmacy, which were previously packaged in multi-unit dose packaging, and which were misbranded and adulterated.

### MANNER AND MEANS OF THE CONSPIRACY

34.     It was part of the conspiracy that KIM DURON MULDER and others picked up and caused to be picked up previously dispensed drugs (the "returned drugs") from the homes that Kentwood Pharmacy serviced.  These returned drugs typically remained in delivery vehicles

overnight and were subject to conditions, including temperature variations, which degraded the drugs.

35. KIM DURON MULDER and others directed employees of Kentwood Pharmacy to obtain the returned drugs from the delivery vehicles and unpack the returned drugs, including drugs which were packaged in multi-unit dose packaging. Multi-unit dose packaged drugs are dispensed solely for the use of the original patient for whom all the drugs are prescribed. Such drugs became cross-contaminated by being commingled with different types of drugs.

36. The defendants and others placed and caused to be placed the returned drugs into manufacturer stock bottles, resulting in the commingling of such previously dispensed drugs with drugs that had never been dispensed. It was further part of the conspiracy that the defendants and others placed and caused to be placed previously dispensed drugs into amber vials. The lot number and expiration date of drugs that were placed into the manufacturer stock bottles did not correspond to the lot number and expiration date listed on the manufacturer stock bottles into which the returned drugs were placed. The amber vials into which the returned drugs were placed often contained no lot number or expiration dates.

37. Some of the drugs which were placed into the stock bottles and the amber vials were drugs which were degraded by, among other causes, overnight storage in the delivery vehicles. Additionally, some of the drugs which were placed into the stock bottles and amber vials were previously packaged in multi-unit dose packaging and were adulterated by cross-contamination from the commingling with other drugs.

38. The defendants and others placed and caused to be placed the stock bottles and amber vials containing the returned drugs back onto the stock shelves of Kentwood Pharmacy.

39.    The defendants and others dispensed, and caused to be dispensed, the returned drugs to persons in the homes.

40.    KIM DURON MULDER and others hid the restocking and dispensing of returned drugs from Kentwood Pharmacy employees after employees complained about the safety and legality of the return, restocking and re-dispensing of drugs.

41.    KIM DURON MULDER and others set up storage and sorting operations for the returned drugs at unlicensed Kentwood Pharmacy facilities and private homes.

42.    The defendants and others billed and directed others to bill health insurance providers for the returned drugs which were dispensed.

43.    The defendants and others misrepresented to the homes what Kentwood Pharmacy was doing with the returned drugs and misrepresented to the homes that Kentwood Pharmacy was legally dispensing drugs.

**OVERT ACTS**

44.    In furtherance of the conspiracy, and to accomplish its object and purposes, the defendants and others committed and caused to be committed, in the Western District of Michigan and elsewhere, the following overt acts:

45.    Throughout the conspiracy, KIM DURON MULDER and Richard Michael Clarke offered, and directed other salespersons and employees to offer, to pick up unused drugs from the homes which Kentwood Pharmacy serviced. The homes accumulated unused drugs for a variety of reasons including because residents of the homes died, residents transferred from the homes, residents' prescriptions changed, and incorrect drugs were delivered to the homes for the residents.

46.     Throughout the conspiracy, KIM DURON MULDER and Richard Michael Clarke directed the Kentwood Pharmacy drivers to pick up any unused drugs when the drivers delivered drugs to the homes.  KIM DURON MULDER and Richard Michael Clarke directed the drivers to deliver such unused drugs picked up from the homes to the Kentwood Pharmacy facilities where the drugs would remain overnight in the delivery vehicles and subject to temperatures and other conditions which degraded the drugs.

47.     Throughout the conspiracy, KIM DURON MULDER directed drug packers to unpack, sort, and restock the returned drugs.  KIM DURON MULDER also directed the drug packers to place the returned drugs into manufacturer stock bottles and amber vials and place those stock bottles and amber vials onto the stock shelves at Kentwood Pharmacy.  KIM DURON MULDER also directed drug packers to use the returned drugs contained in the manufacturer stock bottles and amber vials to fill new prescriptions to be dispensed.

48.     Throughout the conspiracy, CHARLES WAYNE BROOKS was the pharmacist in charge at the Shepherd and Alma pharmacies that were purchased by Kentwood Pharmacy.  CHARLES WAYNE BROOKS was present as the pharmacist in charge and supervised drug packers and delivery workers who sorted returned drugs and placed these returned drugs back into stock at the Shepherd and Alma pharmacies.  On some occasions, CHARLES WAYNE BROOKS examined returned drugs that had been sorted and approved the placement of such drugs back into stock bottles.

49.     Beginning in or about early 2010, KIM DURON MULDER directed employees to unpack and sort the returned drugs at a Kentwood Pharmacy corporate office, which was not a licensed Kentwood Pharmacy facility and was located in a strip mall at 1994-1998 44th Street in Kentwood, Michigan.  KIM DURON MULDER further directed the employees to place the

drugs into amber vials and deliver the drugs to the licensed Kentwood Pharmacy facility located at 2480 44th Street where the amber vials were placed onto the stock shelves to be re-dispensed.

50.     In or about spring or summer of 2010, KIM DURON MULDER and others delivered the returned drugs to a residence, which was not a licensed Kentwood Pharmacy facility, located at 2424 Lake Drive in East Grand Rapids, Michigan, where the returned drugs were stored and sorted for a period of weeks.

51.     In or about the spring and summer of 2010, during the evening hours when other employees were not working at Kentwood Pharmacy, KIM DURON MULDER, Richard Michael Clarke, and Lawrence Anthony Harden took the amber vials containing the returned drugs, which had been sorted at the strip mall corporate office, back to the licensed Kentwood Pharmacy facility located at 2480 44th Street.   KIM DURON MULDER, Richard Michael Clarke, Lawrence Anthony Harden and others removed the returned drugs from the amber vials and placed the returned drugs into manufacturer stock bottles and placed the stock bottles onto the stock shelves.

52.      In or about the summer of 2010, KIM DURON MULDER directed a Kentwood Pharmacy employee to construct a drug-sorting station and stock shelves in an unfinished basement in the residence belonging to Lawrence Anthony Harden and Heather Harden, which was not a licensed Kentwood Pharmacy facility.

53.     In or about the late summer of 2010, KIM DURON MULDER and Lawrence Anthony Harden directed Heather Harden to sort returned drugs in the basement of the Hardens' residence.

54.     From in or about the late summer of 2010 to on or about November 2, 2010, KIM DURON MULDER and Lawrence Anthony Harden told Kentwood Pharmacy employees that

Heather Harden was working as a floating drug packer at various Kentwood Pharmacy licensed facilities in order to conceal her actual work sorting returned drugs in the basement of the Hardens' residence.

55.     From in or about the late summer of 2010 to on or about November 2, 2010, KIM DURON MULDER, Richard Michael Clarke, and Lawrence Anthony Harden told Kentwood Pharmacy employees to place emptied manufacturer stock bottles with their caps into a recycling can.

56.     From in or about the late summer of 2010 to on or about November 2, 2010, KIM DURON MULDER, Lawrence Anthony Harden and Richard Michael Clarke delivered returned drugs and emptied manufacturer stock bottles from the Kentwood Pharmacy facility located at 2480 44th Street in Kentwood, Michigan to the Hardens' residence for the purpose of sorting the returned drugs.

57.     From in or about the late summer of 2010 to on or about November 2, 2010, Lawrence Anthony Harden allowed his basement to be used by Heather Harden to sort returned drugs and place these drugs into the emptied manufacturer stock bottles.

58.     From in or about the late summer of 2010 to on or about November 2, 2010, KIM DURON MULDER, Lawrence Anthony Harden and Richard Michael Clarke took the manufacturer stock bottles filled with returned drugs from the Hardens' residence and delivered the drugs to the Kentwood Pharmacy facility located at 2480 44th Street in Kentwood, Michigan. During weekends and evenings when other employees were not present, KIM DURON MULDER, Lawrence Anthony Harden and Richard Michael Clarke placed the manufacturer stock bottles containing the returned drugs onto the stock shelves at the Kentwood Pharmacy facility located at 2480 44th Street in Kentwood, Michigan.

59.     In or about October 2010, Lawrence Anthony Harden told a Kentwood staff pharmacist that Kentwood Pharmacy was no longer using returned drugs.

60.     In or about the summer and fall of 2010, KIM DURON MULDER directed employees to respond to inquiries by various homes about anonymous letters that the homes received alleging the improper return, restocking and re-dispensing of returned drugs.  During this same time period, KIM DURON MULDER and Richard Michael Clarke drafted, and directed others to draft, responsive letters to the homes denying the allegations of the improper return, restocking, and re-dispensing of returned drugs.

61.     On or about September 7, 2010, Richard Michael Clarke signed a letter to a home denying the allegations about illegal conduct, including the restocking of returned drugs, and claiming that Kentwood Pharmacy was operating "concurrent with all State and Federal guidelines."

62.     On or about September 14, 2010, KIM DURON MULDER signed a letter to a home denying the allegations about illegal conduct, including the restocking of returned drugs, and claiming that Kentwood Pharmacy was operating "concurrent with all State and Federal guidelines."

18 U.S.C. § 1349
18 U.S.C. § 1347
18 U.S.C. § 24(b)

## COUNT 2
### (Conspiracy To Cause Drugs Held For Sale To Be Misbranded and Adulterated)

63.     Paragraphs 1 through 30 are incorporated as though fully set forth herein.

64.     From in or before April 2009 and continuing to November 2, 2010, in the Southern Division of the Western District of Michigan and elsewhere, the defendants,

**KIM DURON MULDER and**
**CHARLES WAYNE BROOKS,**

combined, conspired, confederated and agreed with each other and with other persons, both known and unknown to the grand jury, to perform and cause to be performed certain acts with respect to drugs, while such drugs were held for sale after shipment in interstate commerce, with the intent to defraud and mislead, which resulted in the drugs being misbranded and adulterated, in violation of Title 21, United States Code, Sections 331(k), 333(a)(2), 351(a)(2)(A) and 352(a) and Title 18 U.S.C. § 371.

### PURPOSES OF THE CONSPIRACY

65.     It was the purpose of the conspiracy to return previously dispensed drugs to stock, including drugs that had been dispensed in multi-unit dose packages, so that Kentwood Pharmacy could re-dispense the drugs and charge health insurance providers multiple times for the dispensing of the same drugs.   It was further a purpose of the conspiracy to place the previously dispensed drugs into manufacturer stock bottles in order conceal the illegal restocking and re-dispensing of returned drugs.

### MANNER AND MEANS OF THE CONSPIRACY

66.     The defendants and others picked up, and caused to be picked up, previously dispensed drugs from the homes that Kentwood Pharmacy serviced.

15

67.     The defendants and others directed Kentwood Pharmacy employees to unpack and sort the returned drugs, including multi-unit dose packaged drugs.

68.     The defendants and others placed, and caused to be placed, the returned drugs, including multi-unit packaged drugs, into manufacturer stock bottles, resulting in the commingling of such previously dispensed drugs with drugs that had never been dispensed.  It was further part of the conspiracy that the defendants placed and caused to be placed previously dispensed drugs into amber vials.  The lot number and expiration date of drugs that were placed into the manufacturer stock bottles did not correspond to the lot number and expiration date listed on the manufacturer stock bottles to which the returned drugs were placed.  The amber vials into which the returned drugs were placed often contained no lot number or expiration dates.

69.     The defendants and others placed and caused to be placed the stock bottles and amber vials containing the returned drugs back onto the stock shelves of Kentwood Pharmacy.

70.     The defendants dispensed and caused to be dispensed the returned drugs in the stock bottles and the amber vials to persons in the homes.

71.     KIM DURON MULDER and others hid the restocking and re-dispensing of returned drugs from Kentwood Pharmacy employees after several employees complained about the safety and legality of the return, restocking, and re-dispensing of drugs.

72.     KIM DURON MULDER and others set up storage and sorting operations for the returned drugs at unlicensed Kentwood Pharmacy facilities and private homes.

73.     The defendants and others billed, and directed others to bill, health insurance providers for the returned drugs which were re-dispensed.

74. The defendants and others misrepresented to the homes what Kentwood Pharmacy was doing with the returned drugs and misrepresented to the homes that Kentwood Pharmacy was legally dispensing drugs.

### OVERT ACTS

75. In furtherance of the conspiracy, and to accomplish its purposes, the defendants and others committed and caused to be committed, in the Western District of Michigan and elsewhere, the following overt acts:

76. KIM DURON MULDER and Richard Michael Clarke directed salespersons and employees to offer to pick up unused drugs from the homes which Kentwood Pharmacy serviced. The homes accumulated unused drugs for a variety of reasons including because residents of the homes died, residents transferred from the homes, residents' prescriptions changed, and incorrect drugs were delivered to the homes for the residents.

77. KIM DURON MULDER, Richard Michael Clarke, and Gary William Franks directed the Kentwood Pharmacy drivers to pick up any unused drugs when the drivers delivered drugs to the homes. KIM DURON MULDER, Richard Michael Clarke, and Gary William Franks directed the drivers to deliver such unused drugs to the Kentwood Pharmacy facilities.

78. Throughout the conspiracy, KIM DURON MULDER directed drug packers to unpack, sort, and restock the returned drugs. KIM DURON MULDER also directed the drug packers to place the returned drugs into manufacturer stock bottles and amber vials and place those stock bottles and amber vials onto the stock shelves at Kentwood Pharmacy. KIM DURON MULDER also directed drug packers to use the returned drugs contained in the manufacturer stock bottles and amber vials to fill new prescriptions to be dispensed.

79.     Beginning in or about the summer of 2009, Jessica Lynn Veldkamp directed the drug packers to use the returned drugs contained in the manufacturer stock bottles and amber vials to fill new prescriptions to be dispensed.

80.     In or about the spring of 2009, Gary William Franks directed drivers to remove returned drugs from their packaging, put the returned drugs into amber vials, dump the drugs in the amber vials into corresponding manufacturer stock bottles, and place the stock bottles back onto the stock shelves of Kentwood Pharmacy.

81.     From in or about the spring of 2009 until in or about the beginning of 2010, Erin Rivard reviewed the returned drugs sorted by the packers and approved the restocking of these returned drugs into manufacturer stock bottles which were placed back onto the stock shelves at Kentwood Pharmacy to be re-dispensed.

82.     Throughout the conspiracy, CHARLES WAYNE BROOKS was the pharmacist in charge at the Shepherd and Alma pharmacies that were purchased by Kentwood Pharmacy. CHARLES WAYNE BROOKS was present as the pharmacist in charge and supervised drug packers and delivery workers who sorted returned drugs and placed these returned drugs back into stock at the Shepherd and Alma pharmacies.  On some occasions, CHARLES WAYNE BROOKS examined returned drugs that had been sorted and approved the placement of such drugs back into stock bottles.

83.     Beginning in or about early 2010, KIM DURON MULDER directed employees to unpack and sort the returned drugs at a Kentwood Pharmacy corporate office, which was not a licensed Kentwood Pharmacy facility, located in a strip mall at 1994-1998 44th Street in Kentwood, Michigan.  KIM DURON MULDER further directed the employees to place the

drugs into amber vials and deliver the drugs to the licensed Kentwood Pharmacy facility located at 2480 44th Street where the amber vials were placed onto the stock shelves to be re-dispensed.

84.     In or about spring or summer of 2010, KIM DURON MULDER and others delivered the returned drugs to a residence, which was not a licensed Kentwood Pharmacy facility, located at 2424 Lake Drive in East Grand Rapids, Michigan, where the returned drugs were stored and sorted for a period of weeks.

85.     In or about the spring and summer of 2010, during the evening hours when other employees were not working at Kentwood Pharmacy, KIM DURON MULDER, Richard Michael Clarke, Lawrence Anthony Harden, and Michelle Shedd took the amber vials containing the returned drugs, which had been sorted at the strip mall corporate office, back to the licensed Kentwood Pharmacy facility located at 2480 44th Street.   KIM DURON MULDER, Richard Michael Clarke, Lawrence Anthony Harden, and Michelle Shedd removed the returned drugs from the amber vials and placed the returned drugs into manufacturer stock bottles and placed the stock bottles onto the stock shelves.

86.     In or about the summer of 2010, KIM DURON MULDER directed a Kentwood Pharmacy employee to construct a drug-sorting station and stock shelves in an unfinished basement in the residence belonging to Lawrence Anthony Harden and Heather Harden, which was not a licensed Kentwood Pharmacy facility.

87.     In or about the late summer of 2010, KIM DURON MULDER and Lawrence Anthony Harden directed Heather Harden to sort returned drugs in the basement of the Hardens' residence.

88.     From in or about the late summer of 2010 to on or about November 2, 2010, KIM DURON MULDER, Lawrence Anthony Harden, Heather Harden and Jessica Lynn Veldkamp

told Kentwood Pharmacy employees that Heather Harden was working as a floating drug packer at various Kentwood Pharmacy licensed facilities in order to conceal her actual work sorting returned drugs in the basement of the Hardens' residence.

89.     From in or about the late summer of 2010 to on or about November 2, 2010, KIM DURON MULDER, Richard Michael Clarke, Lawrence Anthony Harden and Jessica Lynn Veldkamp told Kentwood Pharmacy employees to place emptied manufacturer stock bottles with their caps into a recycling can.

90.     From in or about the late summer of 2010 to on or about November 2, 2010, KIM DURON MULDER, Lawrence Anthony Harden and Richard Michael Clarke delivered returned drugs and emptied manufacturer stock bottles from the Kentwood Pharmacy facility located at 2480 44th Street in Kentwood, Michigan to the Hardens' residence for the purpose of sorting the returned drugs.

91.     From in or about the late summer of 2010 to on or about November 2, 2010, Lawrence Anthony Harden allowed his basement to be used by Heather Harden to sort returned drugs and place these drugs into the emptied manufacturer stock bottles.

92.     From in or about the late summer of 2010 to on or about November 2, 2010, KIM DURON MULDER, Lawrence Anthony Harden and Richard Michael Clarke took the manufacturer stock bottles filled with returned drugs from the Hardens' residence and delivered the drugs to the Kentwood Pharmacy facility located at 2480 44th Street in Kentwood, Michigan. During weekends and evenings when other employees were not present, KIM DURON MULDER, Lawrence Anthony Harden and Richard Michael Clarke placed the manufacturer stock bottles containing the returned drugs onto the stock shelves at the Kentwood Pharmacy facility located at 2480 44th Street in Kentwood, Michigan.

93.     In or about October 2010, Lawrence Anthony Harden told a Kentwood staff pharmacist that Kentwood Pharmacy was no longer using returned drugs.

94.     In or about the summer and fall of 2010, KIM DURON MULDER directed employees to respond to inquiries by various homes about anonymous letters that the homes received alleging the improper return, restocking and re-dispensing of returned drugs.  During this same time period, KIM DURON MULDER, Richard Michael Clarke, and Elizabeth Catherine Morgan drafted responsive letters to the homes denying the allegations of the improper return, restocking, and re-dispensing of returned drugs.

95.     On or about September 7, 2010, Richard Michael Clarke and Elizabeth Catherine Morgan signed a letter to a home denying the allegations about illegal conduct, including the restocking of returned drugs, and claiming that Kentwood Pharmacy was operating "concurrent with all State and Federal guidelines."

96.     On or about September 14, 2010, KIM DURON MULDER signed a letter to a home denying the allegations about illegal conduct, including the restocking of returned drugs, and claiming that Kentwood Pharmacy was operating "concurrent with all State and Federal guidelines."

21 U.S.C. §§ 331(k), 333(a)(2), 351(a)(2)(A), and 352(a)
18 U.S.C. § 371

## COUNT 3
### (Structuring)

97.     On or about October 5 and October 6, 2009, in the Western District of Michigan,

Southern Division, the Defendant,

### KIM DURON MULDER,

knowingly and for the purpose of evading the reporting requirements of Section 5313(a) of Title

31, United States Code, and the regulations promulgated thereunder, did structure currency

transactions, to wit: the Defendant made cash deposits of $9,800.00, $9,700.00, and $9,500.00 of

United States currency at three different branches of Huntington National Bank on October 5,

2009 and cash deposits of $9,700, $7,800, and $2,010.00 of United States currency at three

different branches of Huntington National Bank on October 6, 2009.

31 U.S.C. § 5324(a)(3)
31 U.S.C. § 5324(d)(1)

## COUNT 4
### (Conspiracy To Use False Documents In Connection With Health Care Benefits)

98.     Paragraphs 1 through 41 are incorporated as though fully set forth herein.

99.     Beginning in 2009 and continuing through November 2, 2010, in the Southern Division of the Western District of Michigan, the defendant,

**KIM DURON MULDER,**

combined, conspired, confederated and agreed with other persons, both known and unknown to the grand jury, to knowingly and willfully make and use materially false documents, in matters involving health care benefit programs, knowing the same to contain materially false, fictitious and fraudulent statements and entries in connection with the delivery of and payment for health care benefits, items and services, in violation of 18 U.S.C. § 1035(a)(2) and 18 U.S.C. § 371.

## PURPOSES OF THE CONSPIRACY

100.    It was the purpose of the conspiracy to create false records of prescriptions for drugs that Kentwood Pharmacy dispensed when no prescription was actually issued or no record of the prescription could be found.  It was the further purpose of the conspiracy to create such false prescription records in order to avoid findings of record deficiencies during health insurance provider audits.

## OVERT ACTS

101.    In furtherance of the conspiracy, and to accomplish its purposes, the defendants committed and caused to be committed, in the Western District of Michigan and elsewhere, the following overt acts:

102.    In or about 2009, KIM DURON MULDER instructed Elizabeth Catherine Morgan to create any false records necessary to avoid findings of record deficiencies by health insurance provider audits.

103.    Beginning in 2009 and continuing through November 2010, Lawrence Anthony Harden and Elizabeth Catherine Morgan compiled lists of prescriptions that were missing in the records.   During this same time period, Lawrence Anthony Harden and Elizabeth Catherine Morgan created false prescription records to match drugs that were billed to health insurance providers.

18 U.S.C. § 1035(a)(2)
18 U.S.C. § 371

## COUNTS 5-7
### (Money Laundering)

104.    Paragraphs 1-74 are incorporated as though fully set forth herein.

105.    On or about the dates listed below, in the Western District of Michigan, Southern

Division, and elsewhere, the defendant,

### KIM DURON MULDER,

did knowingly engage in monetary transactions by, through, and to financial institutions,

affecting interstate commerce, in criminally-derived property of a value greater than $10,000.00,

said property having been derived from specified unlawful activity committed in the Western

District of Michigan, namely, health care fraud:

| Count | Date | Transaction |
|---|---|---|
| 5 | August 16, 2010 | The defendant deposited a $100,000.00 check from a Kentwood Pharmacy account at Mercantile Bank into a Midtowne Pharmacy account at Mercantile Bank. |
| 6 | September 24, 2010 | The defendant deposited a $100,000.00 check from a Kentwood Pharmacy account at Mercantile Bank into a Midtowne Pharmacy account at Mercantile Bank. |
| 7 | October 18, 2010 | The defendant deposited a $35,000.00 from a Kentwood Pharmacy account at Mercantile Bank into a Midtowne Pharmacy account at Mercantile Bank. |

18 U.S.C. ' 1957

25

## COUNT 8
### (Conspiracy To Acquire Controlled Substances By Misrepresentation)

106.    From in or before 2008 and continuing to November 2, 2010, in Southern Division of the Western District of Michigan and elsewhere, the defendant,

**KIM DURON MULDER,**

did combine, conspire, confederate and agree with others, both known and unknown to the Grand Jury, to knowingly and intentionally acquire and obtain possession of controlled substances by misrepresentation, fraud, forgery, deception, and subterfuge.

21 U.S.C. §§ 843(a)(3) and 846

## <u>COUNT 9</u>
**(Maintaining A Drug-Involved Premises Within 1000 Feet Of A School)**

107.    In or about the Spring of 2010, in the Southern Division of the Western District of Michigan, the defendant,

**KIM DURON MULDER,**

knowingly and intentionally opened, used and maintained a residence at 2424 Lake Drive in East Grand Rapids, Michigan, for the purpose of manufacturing controlled substances within 1,000 feet of the East Grand Rapids Middle School, a public secondary school.

21 U.S.C. §§ 856(a)(1), 856(b) and 860

27

## COUNT 10
**(Maintaining A Drug-Involved Premises)**

108.    Beginning in or about February 2010 and continuing to in or about August 2010,

in the Southern Division of the Western District of Michigan, the defendant,

**KIM DURON MULDER,**

knowingly and intentionally opened, leased, rented, used and maintained offices located at 1994-

1998 44th Street in Kentwood, Michigan for the purpose of manufacturing controlled substances.

21 U.S.C. §§ 856(a)(1) and 856(b)

## COUNT 11
### (Tampering With Consumer Products)

109.    Beginning by April 2009 and continuing to in or about May 2010, in the Southern

Division of the Western District of Michigan, the defendant,

**KIM DURON MULDER,**

did knowingly and with reckless disregard for the risk that another person would be  placed in

danger of death and bodily injury and under circumstances manifesting extreme indifference to

such risk, tampered and aided and abetted the tampering with consumer products that affected

interstate and foreign commerce and the labeling of, and containers for, such products, in that

the defendant restocked and re-dispensed drugs that had been dispensed in multi-unit dose

packages and then returned to Kentwood Pharmacy and directed others to restock and re-

dispense such drugs, when the defendant knew that such drugs were contaminated and

adulterated by being previously packaged with other drugs in the multi-unit dose packages.

18 U.S.C. § 1365(a)(4)
18 U.S.C. § 2

### FORFEITURE ALLEGATION
### (Conspiracy to Commit Health Care Fraud)

The allegations contained in Count 1 of this Third  Superseding Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant to 18 U.S.C. § 982(a)(7).

Upon conviction of the offense in violation of 18 U.S.C. §§ 1349 and 1347 set forth in Count 1 of this Third Superseding Indictment, the defendants,

**KIM DURON MULDER and
CHARLES WAYNE BROOKS,**

shall forfeit to the United States of America, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.  The property to be forfeited includes, but is not limited to, the following:

1.  MONEY JUDGMENT: A sum of money equal to at least $30,000,000.00, which represents the gross proceeds traceable to the offense charged in Count 1.

2.  SUBSTITUTE ASSETS: If any of the property described above, as a result of any act or omission of the defendants:

      a.  cannot be located upon the exercise of due diligence;

      b.  has been transferred or sold to, or deposited with, a third party;

      c.  has been placed beyond the jurisdiction of the court;

      d.  has been substantially diminished in value; or

      e.  has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to the forfeiture of substitute property pursuant to

21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c).

18 U.S.C. § 982(a)(7)
21 U.S.C. § 853(p)
18 U.S.C. § 982(b)(1)
28 U.S.C. § 2461(c)

## FORFEITURE ALLEGATION
### (Structuring)

The allegations contained in Count 3 of this Third Superseding Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant to 31 U.S.C. § 5317(c)(1).

Pursuant to 31 U.S.C. § 5317(c)(1), upon conviction of an offense in violation of 31 U.S.C. § 5324, the defendant,

**KIM DURON MULDER,**

shall forfeit to the United States of America all property, real or personal, involved in the offense and any property traceable to such property. The property to be forfeited includes, but is not limited to, the following:

1. MONEY JUDGMENT: A sum of money equal to at least $48,510.00, which represents the property involved in the offense.

2. SUBSTITUTE ASSETS: If any of the property described above, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to the forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 31 U.S.C. § 5317(c)(1)(B) and 28 U.S.C. § 2461(c).

31 U.S.C. § 5317(c)(1)(A), (B)
21 U.S.C. § 853(p)
28 U.S.C. § 2461(c)

32

## FORFEITURE ALLEGATION
### (Money Laundering)

The allegations contained in Counts 5, 6, and 7 of this Third  Superseding Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant to 18 U.S.C. § 982(a)(1).

Pursuant to 18 U.S.C. § 982(a)(1), upon conviction of an offense in violation of 18 U.S.C. § 1957, the defendant,

### KIM DURON MULDER,

shall forfeit to the United States of America any property, real or personal, involved in such offense, and any property traceable to such property.  The property to be forfeited includes, but is not limited to, the following:

1.     MONEY JUDGMENT: Pursuant to 18 U.S.C. § 982(a)(1), a sum of money equal to $100,000.00 for Count 5, $100,000.00 for Count 6, and $35,000.00 for Count 7, which represents the property involved in each of these offenses.

2.     SUBSTITUTE ASSETS: If any of the property described above, as a result of any act or omission of the defendant:

      a.     cannot be located upon the exercise of due diligence;

      b.     has been transferred or sold to, or deposited with, a third party;

      c.     has been placed beyond the jurisdiction of the court;

      d.     has been substantially diminished in value; or

      e.     has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to the forfeiture of substitute property pursuant to

21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c).

18 U.S.C. § 982(a)(1)
21 U.S.C. § 853(p)
18 U.S.C. § 982(b)(1)
28 U.S.C. § 2461(c)

A TRUE BILL

_____
GRAND JURY FOREPERSON

PATRICK A. MILES, Jr.
United States Attorney

_____
RAYMOND E. BECKERING III
ADAM B. TOWNSHEND
Assistant United States Attorneys